Edmund H. LINN, Plaintiff, Appellee,

v.

ANDOVER NEWTON THEOLOGICAL SCHOOL, INC., Defendant, Appellant.

Edmund H. LINN, Plaintiff, Appellant,

v.

ANDOVER NEWTON THEOLOGICAL SCHOOL, INC., Defendant, Appellee.

Nos. 88–1257, 88–1258 and 88–1394.

United States Court of Appeals, First Circuit.

Heard Jan. 11, 1989.

Decided April 27, 1989.

Warren H. Pyle, Boston, Mass., with whom Barbara Hickingbottom and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, P.C., Boston, Mass., were on brief, for Edmund H. Linn.

Leonard F. Clarkin with whom Susan A. Jackson, Timothy M. Hughes and Haussermann, Davison & Shattuck, Boston, Mass., were on brief, for Andover Newton Theological School.

Before COFFIN and BREYER, Circuit Judges, and PETTINE,* Senior District Judge.

COFFIN, Circuit Judge.

In 1981, plaintiff-appellee Edmund Linn was discharged from his tenured faculty position by the Andover Newton Theological School (the School). Believing he was fired unlawfully, Linn brought an action in the United States District Court for the District of Massachusetts alleging that his termination violated both the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA), and his contract of tenured employment with the School. A jury agreed. Specifically, in response to three interrogatories, the jury found that (1) but for his age, Linn would not have been fired, (2) the School had acted willfully under the ADEA, and (3) with respect to Linn's contract claim, there was no bona fide financial exigency justifying the firing. The district court accordingly entered judgment for Linn and awarded him $604,-154.08 in damages.[1]

The School now appeals, raising a number of issues, the most significant of which relate to the size of the verdict. Linn also raises an issue concerning the award, claiming he is entitled to an additional $38,-263.17 in liquidated damages. Finding merit in two of the School's contentions, we reduce the award; in all other respects, we leave the judgment intact. We turn directly to these issues, seeing no need for a preliminary discussion of the case's general background.

---

* Of the District of Rhode Island, sitting by designation.

1. In addition to the state contract claim, the complaint contained three other state counts. These counts were dismissed prior to trial and are not in dispute here. Also prior to trial, the district court granted partial summary judgment for Linn on the remaining state law contract claim, finding that the School had not followed the contractually prescribed procedures governing the elimination of teaching positions.

## I.

### EVIDENTIARY RULINGS

■ The School contests two of the district court's evidentiary rulings, but we need reach the merits of only one. The School admits that it did not object to the introduction of an agenda prepared by the School's president for an executive meeting, which it now claims was hearsay and highly prejudicial, but argues that we should overlook its failure to make a contemporaneous objection because the admission of the agenda constituted plain error. We have stated repeatedly that absent extraordinary circumstances, we will not in a civil case excuse a party's failure to make a contemporaneous objection. *See, e.g., Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1336 (1st Cir.1988); *Allied International Inc. v. International Longshoremen's Ass'n,* 814 F.2d 32, 39–40 (1st Cir.1987). The circumstances here being far from extraordinary, we do not address this issue.

■ The School also objects to the admission of a memorandum prepared for the faculty by one of its deans discussing the potential adverse effects on the School of Congress' decision to expand the ADEA's coverage to include employees between the ages of 65 and 70.[2] The memo begins by stating that the change in the law is "an unfortunate turn of events" and that "we should deal with it as a faculty before any individual becomes the focus of attention." The dean then lists the "problems" he has with the ADEA's expanded coverage; chief among them are that:

(1) without a mandatory retirement age of 65, the School "probably would be a much less effective institution";

(2) with tenure, "a person could cease developing and go on for several years," and without a mandatory age of 65, we will have to accept "a further five unsatisfactory years";

(3) if retirement is fixed at 70, by 1992 10 faculty members will be in their 60's and 14 will be 56 or older; the change would mean a significant "bunching" of the faculty in the older age bracket.

The memo concludes by stating that "we have here a potentially damaging situation" and that, depending upon its legality, the School should consider the possibility of adopting a "covenant" that would abolish tenure at 65 and contain a general understanding that everyone will retire at 65, with the possibility of remaining on by invitation on a yearly basis.

The School argues that because it, like any other institution, has an obligation to keep abreast of changes in the law and to study those changes, it was improper to allow the jury to infer discriminatory motive from the memo. Indeed, the School points out that the law requires it to be aware of the ADEA's regulations, citing 29 U.S.C. § 627 (employers must post conspicuous notices on premises with information about the Act). In the School's view, therefore, its consideration of the pending changes in the law is not a reasonable basis from which a jury could infer that the School intended to violate the law. The School also contends that even if the memo was relevant, it nonetheless should have been excluded on public policy grounds because the School could not have avoided study of the pending changes.

Institutions must of course be free to study and consider legislation affecting them and to inform their members of the possible effects of such legislation. But trial courts are afforded wide latitude in assessing the relevancy of proffered evidence, and therefore it is not necessary for us to conclude that we would have ruled similarly. It is enough that the district court remain within permissible limits in admitting the memo. *Willco Kuwait (Trading) S.A.K. v. deSavary,* 843 F.2d 618, 626–27 (1st Cir.1988); *United States v. Sorrentino,* 726 F.2d 876, 886 (1st Cir. 1984).

In this case, while one might well interpret the memo in a benign manner, we

---

**2.** Prior to this change, which became effective July 1, 1982, the ADEA covered only individuals between the ages of 40 and 65. *See* 29 U.S.C. § 631. At the time of his discharge in 1981, Linn was 62 and therefore fell within the Act's coverage even without the amendment.

cannot say that the district court abused its discretion in deeming it "a far different situation than a study. It's actually an editorial comment by the dean to the faculty." Given its purpose of exploring ways to relieve the School of the burden of older professors, a not unreasonable inference to be drawn from the memo is that the dean believed older professors, as a *group*, were simply less valuable than their younger colleagues. In enacting the ADEA, it is precisely this type of stereotyping on the basis of age that Congress prohibited employers from acting upon. The memo, therefore, was clearly relevant to the central question in the case: whether the School would fire a faculty member because of his age.[3]

*Stanojey v. Ebasco Services, Inc.*, 643 F.2d 914 (2nd Cir.1981), relied upon by the School, is not to the contrary. There, the Second Circuit upheld the district court's decision to exclude evidence that an employer "was aware of the impending amendment to the ADEA and was *studying* its likely effect." *Id.* at 922 (emphasis added).[4] Because we are told nothing more about the evidence, we must accept the second circuit's characterization of it as a "study." As we stated above, we do not disagree with this general proposition. But here, the district court supportably found that the memo was more than a study.[5]

As for the School's independent public policy argument, we believe institutions are amply protected by the rules of evidence. Had the School simply studied the pending changes in the law, it would have had a strong case to exclude the memo on relevancy grounds.

3. The School does not argue that the dean played an insignificant role in Linn's termination, and therefore, that his state of mind was irrelevant.

4. It is obviously significant that in *Stanojev* the second circuit upheld a discretionary ruling. We are asked here to reverse the district court and find that it abused its discretion.

5. The School also argues that even if relevant, the memo should have been excluded because it

## II.

## JURY INSTRUCTIONS

The School objects to two instructions given by the district court. We find that both objections were waived at trial.

### A. *Financial Exigency*

At trial, the School relied on evidence of its financial condition as a defense to Linn's breach of contract claim. It is undisputed that, under the contract, Linn could be fired in the event of "financial exigency." It is also undisputed that Linn's 1980 contract incorporated by reference the 1972 Recommended Institutional Regulations on Academic Tenure and Freedom, which discuss the School's right to discharge a tenured professor because of "financial exigency," but apparently do not define the term. The dispute here is over whether the district court properly defined that term for the jury.

In an effort to ensure that the court did not base its instructions on the revised 1976 regulations, which had not been incorporated into the contract, the School submitted requests for jury instructions based on cases interpreting the 1972 guidelines. The court denied the requests, but stated that it would use the 1972 regulations in defining "exigent circumstances." The School now claims that the court ultimately did not use the 1972 regulations but looked instead to the 1976 regulations for guidance in defining "financial exigency."

 The School objects specifically to the following portion of the court's instructions:

an imminent financial crisis that threatens the survival of the institution as a whole and that cannot be alleviated by

was highly prejudicial, citing a portion of the memo in which the dean states that the change in the ADEA will mean that "with tenure, everyone would remain until age 70 unless incompetence or moral 'turpitude' were publicly proved...." The School claims that this incorrect statement of the law could have confused and misled the jury. This argument was not raised below and we therefore do not reach it on appeal. *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979).

less drastic means; in other words, a financial exigency that would justify termination of a tenured faculty member occurs only as a last resort where there is a shortage of operating funds even after every effort has been made to meet the need in other ways.

Because we find that the School's objections following the charge were not sufficient under Fed.R.Civ.P. 51, we need not decide whether the district court's definition of exigency did violence to the parties' intentions. We have warned trial attorneys countless times that "Rule 51 means what it says: the grounds for objection must be stated 'distinctly' after the charge to give the judge an opportunity to correct his error." *Jordan v. United States Lines, Inc.* 738 F.2d 48, 51 (1st Cir.1984). *See also, e.g., Elwood v. Pina,* 815 F.2d 173, 175–76 (1st Cir.1987); *Joia v. Jo–Ja Service Corp.,* 817 F.2d 908, 919 (1st Cir.1987). This is not a mere technical requirement serving no useful end. Trial judges are not mind readers. If there is a problem with the instructions, the judge must be told *precisely* what the problem is, and as importantly, what the attorney would consider a satisfactory cure. We will not order a new trial on the basis of an alleged error that the district court may have been willing and able to correct had he been made aware of the basis for counsel's objection.[6]

In this case, the School objected to the "financial exigency" charge on two grounds. Its first objection consisted of a one-sentence request that the judge add to the charge by instructing the jury that an "endowment doesn't have to be used up before there is a financial exigency." The judge responded just as briefly that he could not see what that had "to do with it one way or the other," and therefore denied the request. Counsel at that point failed to elaborate on his point, and instead simply moved on to his next objection. If counsel believed a specific instruction on the significance of the School's endowment was necessary, it was incumbent upon him to say why. It is not good enough simply

to ask for an instruction. The trial judge must be provided with at least some explanation of the basis for that request, particularly where the court has made it clear that he does not see the relevance of the proposed instruction. *Cf. United States v. Piva,* 870 F.2d 753, 759 (1st Cir.1988) (objections to evidentiary rulings).

The School next objected to the financial exigency charge on the ground that, under the case law, it is unnecessary for there to be "imminent bankruptcy," claiming that that requirement "is in the 1976 AAUP cases." This time the objection consisted of two sentences; once again there was no rebuttal to the court's response denying the request—which was simply "I didn't say there had to be." The actual term used by the court was "imminent financial crisis."

We need not belabor the point. At a minimum, counsel should have reminded the court that it had agreed to use the 1972 guidelines and then explained why he believed that, even absent the specific term "bankruptcy," the instruction was erroneous. By failing to respond to the judge's answer, counsel undoubtedly left the court with the impression that his objection was only with the term bankruptcy and not with the general content of the charge.

### B. *Willfulness*

 The School does not contend that the court's initial charge on willfulness was erroneous. Rather, the School objects to the manner in which the court handled a question from the jury regarding this issue. After deliberating for some time, the jury returned and asked to see the exact wording of the statute, hoping to determine whether an "unintentional" act could be "willful or reckless." The court denied the jury's request to see the statute and instead refreshed the jury on the initial willfulness charge. After the jury retired again, counsel for the School stated: "For the record, I object. Off the record, it

6. "The object of this rule is to afford the trial judge an opportunity upon second thought, and before it is too late, to correct any inadvertent

or erroneous failure to charge." *Marshall v. Nugent,* 222 F.2d 604, 615 (1st Cir.1955).

sounded fine." The School's initial brief does not even mention this obvious waiver problem, much less demonstrate why we should overlook it. Nor does its reply brief, even though Linn's main brief pointed out the lack of a proper objection. The issue is waived.

### III.

### DAMAGES

■ After finding the School liable on both the ADEA and contract claims, the jury awarded Linn $79,307 in front pay and $247,440 in back pay. The district court reduced the back pay award to $166,511.03 because, prior to trial, Linn had received $42,665.80 in social security benefits and $38,263.17 in pension benefits. The court then awarded him $166,511.03 in liquidated damages under the ADEA, the jury having found the violation to be willful. The court also awarded Linn $73,813 in prejudgment interest and $79,748.85 in attorney's fees. Finally, it ordered the School to pay to Linn's pension account $38,263.17, the amount deducted from the back pay award because Linn had received it prior to trial. The total award was $604,154.08.

We are not unsympathetic with the School's general complaint that the award was excessive. Linn's salary at the time he was discharged was roughly $30,000. To the extent that a monetary award can ever make a wrongfully discharged employee whole again, Linn's recovery of over $500,-000 ($604,000 less attorney's fees) appears quite generous. But as we said in *Kolb v. Goldring, Inc.*, 694 F.2d 869, 871 (1st Cir. 1982), "[g]enerousness of a jury's award does not alone justify an appellate court in setting it aside." As a reviewing court, we will reduce the verdict only if it is "shown to exceed any rational appraisal or estimate of the damages ...," *id.*, or if the trial court lacked authority to make a particular award. We turn then to the School's specific contentions.

### A. *Prejudgment Interest*

■ The district court awarded Linn $166,511.03 in back pay and an equal amount in liquidated damages. The court also awarded him $73,813 in prejudgment interest on the back pay award. The School contends that the district court erred as a matter of law in awarding prejudgment interest on top of liquidated damages, citing our decision in *Kolb v. Goldring, Inc.*, 694 F.2d at 875. We agree that in *this* case, prejudgment interest should not have been awarded.

Under the ADEA, a court is authorized upon a finding of willfulness to award liquidated damages in an amount equal to the back pay award. 29 U.S.C. § 626(b). Prior to a 1985 Supreme Court decision, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), there was virtual consensus among the circuits regarding the proper relationship between prejudgment interest and liquidated damages. In addition to our decision in *Kolb*, at least five other circuits had held squarely that where full liquidated damages are awarded, prejudgment interest is not also recoverable under the ADEA.[7] The rule was based on the view that Congress intended for liquidated damages under the ADEA to be compensatory in nature and to cover, among other things, loss due to delay—precisely what prejudgment interest protects against. To permit recovery of both prejudgment interest and liquidated damages would result, therefore, in a successful plaintiff recovering twice for the same loss.[8] Only the Ninth Circuit had

---

7. *Blim v. Western Electric Co.*, 731 F.2d 1473, 1479–80 (10th Cir.1984); *Rose v. National Cash Register Corp.*, 703 F.2d 225, 230 (6th Cir.1983); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1101–03 (8th Cir.1982); *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir.1981); *O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1552 (11th Cir.1984), (*overruled by Lindsey v. American Cast Iron Pipe Co.*, 810 F.2d 1094, 1101–02 (11th Cir.1987)); *see also Koss-*

man v. Calumet County, 800 F.2d 697, 702–03 (7th Cir.1986) (post-*Thurston*).

8. In arriving at this conclusion, every court found it significant that in enacting the ADEA, Congress incorporated by reference most of the Fair Labor Standards Act (FSLA), and in doing so, dictated that liquidated damages under the ADEA were to be calculated as they are under the FSLA. It is well settled that under the FSLA, prejudgment interest may not be award-

reached a contrary result, taking the view that liquidated damages under the ADEA are punitive. *Criswell v. Western Airlines, Inc.,* 709 F.2d 544, 556–57 (9th Cir. 1983).

In *Thurston,* 469 U.S. 111, 114, 105 S.Ct. 613, 618 (1985), the Supreme Court was not faced with the question of whether prejudgment interest can be awarded on top of liquidated damages under the ADEA. The Court was asked instead to clarify "what constitutes a 'wilful' violation of the ADEA"—the prerequisite to an award of liquidated damages. In the course of doing so, the Court stated that "[t]he legislative history of the ADEA indicates that Congress intended for liquidated damages to be punitive in nature." *Id.* at 125, 105 S.Ct. at 624. In reaching this conclusion, the Court relied almost exclusively on statements made by Senator Javits when the original bill was being considered in 1967.

On the basis of this statement, the Second Circuit, facing the issue for the first time, concluded that a successful plaintiff could recover both liquidated damages and prejudgment interest under the ADEA. *Reichman v. Bonsignore, Brignati & Mazzotta P.C.,* 818 F.2d 278, 281–82 (2nd Cir. 1987). The Eleventh Circuit, also solely on

the basis of the *Thurston* Court's characterization of liquidated damages as punitive, expressly overruled an earlier decision, and held likewise. *Lindsey v. American Cast Iron Pipe Co.,* 810 F.2d 1094, 1101–02 (11th Cir.1987). Both courts apparently believed that if liquidated damages were meant to serve, in whole or in part, as a deterrent, then they could not also have been intended to compensate plaintiffs for loss due to delay. *Contra Blum v. Witco Chemical Corp.,* 829 F.2d 367, 382 (3rd Cir.1987) (not reaching issue, but stating that purpose of liquidated damages is both to deter and to compensate for loss due to delay). The Seventh Circuit has concluded, however, that even after *Thurston,* a successful plaintiff may not recover both liquidated damages and prejudgment interest under the ADEA. *Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321, 1336–37 (7th Cir.1987), *vacated on other grounds,* —— U.S. ——, 108 S.Ct. 1990, 100 L.Ed.2d 223 (1988).

We need not decide definitively in this case whether our decision in *Kolb* can stand in light of *Thurston,* because Linn, for whatever reason, took the position, on appeal and below, that he may not recover both awards under the ADEA.[9] By doing so, he concedes that our decision in *Kolb* is

ed on top of liquidated damages because the latter were meant to compensate successful plaintiffs for a variety of harms, including loss due to delay. *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 715–16, 65 S.Ct. 895, 906–07, 89 L.Ed. 1296 (1945). Because Congress is presumed to have known of this longstanding interpretation when it chose to incorporate the FSLA's remedial scheme, *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978), courts reasoned that the ADEA also should be construed to bar a separate award of prejudgment interest on top of liquidated damages. *See, e.g., Rose v. National Cash Register Corp.,* 703 F.2d 225, 230 (6th Cir.1983).

A few courts also relied heavily upon a House Conference Report leading up to the 1978 amendments to the ADEA, which stated that "[t]he ADEA as amended by this act does not provide remedies of a punitive nature." *See, e.g., Gibson v. Mohawk Rubber, Co.,* 695 F.2d 1093, 1102 (8th Cir.1982).

**9.** We note, however, that it is far from clear to us that our decision in *Kolb* must be abandoned. *Thurston* dealt only tangentially with the precise

issue before us here. Moreover, the relevant portion of that opinion was quite brief. Indeed, the second and eleventh circuit decisions turned on a single statement by the Court: "... liquidated damages are punitive in nature." 469 U.S. at 125, 105 S.Ct. at 624. Had the Court intended for so much to turn on its characterization of liquidated damages, it seems reasonable to assume it would have mentioned contrary legislative history, and in particular would have reconciled its position with the House Conference Report to the 1978 amendments, relied upon so heavily by circuit courts in concluding that liquidated damages are compensatory. The House Report, which post-dated the legislative history cited by the Court, states flatly that "the ADEA as amended by this act does not provide remedies of a punitive nature." *Gibson,* 695 F.2d at 1102. It also is worth noting that despite the almost total agreement among the circuits that liquidated damages were not meant to be punitive, the *Thurston* Court does not mention a single lower court decision. In short, we will not lightly presume that the Court intended to overrule, *sub silentio,* a view held by virtually every circuit to have considered the issue.

the law for this case. He contends, nonetheless, that it was permissible for the court to award both liquidated damages and prejudgment interest because the former was awarded under the ADEA and the latter on the state law contract claim.

The district court did not make clear whether it was awarding prejudgment interest under the ADEA or state law. We will assume that it was on the contract claim because Linn conceded in his trial brief on damages that he could not recover prejudgment interest under the ADEA, and therefore was requesting it only under state law. Moreover, we think it fair to assume that if the court had awarded prejudgment interest under the ADEA, it at least would have noted the direct conflict with *Kolb*. The question, then, is whether, taking *Kolb* as the law, Linn can recover both liquidated damages and prejudgment interest as long as the latter was not awarded under the ADEA. We conclude the answer is no.

In *Kolb*, we expressly held that both liquidated damages and prejudgment interest may not be awarded under the ADEA. By accepting *Kolb* as the law, we also accept its rationale, which was that because liquidated damages under the ADEA cover loss due to delay, permitting an additional award of prejudgment interest would result in a plaintiff recovering twice for the same injury. The fact that prejudgment interest is awarded under state law does not alter this analysis.

As we said recently in *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1345, "a plaintiff is entitled to only one full recovery, no matter how many legal grounds may support the verdict...." In that case, we also noted with approval the district court's ruling "that plaintiff, although entitled to the same damages under both federal and state statutes, could collect them but once." *Id.* at 1344 n. 7.[10] Thus, Linn may not recover twice for the same injury, regardless of how many legal grounds support the award. Yet that is precisely what occurred.

First, the court awarded Linn liquidated damages. Under *Kolb*, this award covered, among other things, the loss Linn incurred as a result of receiving his salary and benefits later rather than sooner. Linn also received prejudgment interest. It makes no difference that the interest was awarded under state law. It was still compensating him for an injury already rectified by the award of liquidated damages—the loss he incurred as a result of delay. Thus, by recovering twice for the same injury, Linn was made more than whole. There being no suggestion in *this* case that either the ADEA or state contract law was intended to make successful plaintiffs more than whole, the award of prejudgment interest was error. Accordingly, $73,813 should be deducted from the award.

B. *Front Pay*

■ The School's final contention is that the jury's award of $79,307 in front pay was excessive because it was based on the assumption that Linn would have worked until the end of the academic year in which he turned seventy. The School argues that because it could have fired him six months earlier when he turned seventy, the award should have been reduced accordingly. In the alternative, the School suggests that if the district court was not inclined to adopt this bright-line cut-off point, it should have permitted the parties to introduce evidence as to how long Linn would have worked absent age discrimination.

We note first that the district court did not assume that the end of the academic year was the relevant date for purposes of calculating front pay. In fact, during a bench conference he expressly stated that "the operative figure is age 70." Rather than adopt Linn's seventieth birthday as the cut-off point, however, the court exercised its broad discretion, *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir.1985), and, contrary to the School's suggestion, *did* permit the jury to determine how long Linn would have worked absent the unlawful age discrimination.

10. As in this case, the plaintiff in *Freeman* prevailed under both the ADEA and state law.

Reviewing the trial record, we conclude, however, that Linn did not produce evidence sufficient to establish that the School would have kept him on through the academic year. Indeed, the only evidence he points to is testimony by Dean Peck on the first day of the liability stage of the bifurcated trial. The Dean stated that although the School had a mandatory retirement age of 65, the trustees could ask a faculty member to remain on for up to three years on a yearly basis through the academic year in which he or she turned 68. Linn claims that this demonstrates the School had a practice of retaining its professors through the academic year in which they reached retirement age.

We read this scant evidence as saying only that if the School was pleased with a faculty member, it would retain him for three more academic years. It says nothing about the practice with regard to professors the School felt it could no longer afford to retain. In short, without more evidence, we believe it was unreasonable to assume that the School would have kept Linn on any longer than necessary. To assume it would have is simply at odds with the plain fact that the School fired him three years before he turned 65.[11] Accordingly, on remand, the district court should award front pay only through Linn's seventieth birthday.[12]

C. *Reduction of received pension benefits prior to calculating liquidated damages.*

The final issue before us is raised by Linn. He claims that the district court, prior to calculating liquidated damages, should not have deducted from the back pay award the pension benefits he received after his discharge. We have reviewed carefully all of the district court's calculations and conclude that it was not error in this case to subtract the received pension benefits.

The judgment is vacated and remanded with instructions to reduce the verdict in accordance with this opinion. The School to pay two-thirds costs in No. 88–1258; Linn to pay costs in 88–1394.

---

11. The School's retirement policy was identified at trial as Plaintiff's Exhibit # 116. It was not made part of the record on appeal, and therefore can be of no help to Linn now. We are confident that if the School's official policy conclusively resolved this issue, Linn would have quoted liberally from it and made it part of the appellate record.

12. Because the School takes the position on appeal that it would have been permissible for the district court to adopt "a bright-line rule" and award damages through Linn's seventieth birthday, we need not consider its claim that Linn may have chosen to retire prior to that time.