October 28, 1994 UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 94-1171

JOSE L. SANCHEZ,

Plaintiff, Appellee,

v.

PUERTO RICO OIL COMPANY,

Defendant, Appellant.

ERRATA SHEET ERRATA SHEET

The opinion of the court issued on September 29, 1994, is
corrected as follows:

1. After first sentence of footnote 3, (p.5), delete
remainder of footnote and replace with the following:

Plaintiff conceded at trial, however, that
appellant's general manager, George Gonzalez,
had reprimanded him on approximately four
occasions in the 1988-1990 time frame. The
significance of these reprimands to
plaintiff's overall job performance involved
a fact determination within the jury's
exclusive province.

2. On p.7, delete last sentence of first paragraph and
replace with the following:

Appellant disputed plaintiff's version of
this conversation, suggesting that any
remarks by Gonzalez were motivated solely by
a concern for plaintiff's health and physical
condition.

3. On p.15, delete last two sentences of first paragraph
and replace with the following:

Last, but surely not least, after having
refused to reinstate Sanchez, Gonzalez
questioned him about his age and made other
age-related remarks that the jury reasonably
could have construed as evincing bias.

Indeed, if the jury credited plaintiff's
version of this conversation as it had a
right to do, especially since Gonzalez,
though available, was never called to testify
at trial Gonzalez's statements comprise
potent evidence of age-based animus.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1171

JOSE L. SANCHEZ,

Plaintiff, Appellee,

v.

PUERTO RICO OIL COMPANY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jose Antonio Fuste, U.S. District Judge]

Before

Selya, Boudin and Stahl, Circuit Judges.

Enrique Velez-Rodriguez, with whom Lespier & Munoz-Noya was
on brief, for appellant.
Federico Lora Lopez for appellee.

September 29, 1994



SELYA, Circuit Judge. This is a ghost ship of an SELYA, Circuit Judge.

appeal. One hears the creak of the rigging, the groan of the

timber, and the muted sound of voices through the fog but there

is nothing solid to be grasped. In the end the appeal, like the

ghost ship, vanishes into the mist, leaving things exactly as

they were. The tale follows.

I. AN OVERVIEW I. AN OVERVIEW

Plaintiff-appellee Jose L. Sanchez sued defendant-

appellant Puerto Rico Oil Company (Proico) asserting that the

company constructively discharged him due to his advanced age. A

jury agreed; it found that Proico had willfully violated both the

Age Discrimination in Employment Act, 29 U.S.C. 621 634 (1988)

(ADEA), and a Puerto Rico statute proscribing employment

discrimination, P.R. Laws Ann. tit. 29, 146 (Supp. 1989) (Law

100). The jury awarded Sanchez $40,376.80 in backpay under ADEA

and $150,000 for mental and moral suffering under Law 100.1

Proico moved for judgment notwithstanding the verdict, Fed. R.

Civ. P. 50(b), or for a new trial, Fed. R. Civ. P. 59(a). The

district court reduced the damage awards to $38,000 for backpay

and $37,500 for suffering, but otherwise gave Proico cold gruel.

The court then doubled the reduced awards, bringing Proico's

aggregate liability to $151,000. This appeal ensued.

Although appellant aggressively advances an armada of



1In both the jury instructions and the verdict form, the
district court appropriately precluded the jury from awarding
damages for backpay under Law 100 in the event that it awarded
such damages under the ADEA.

4

artful arguments, only five are worthy of extended comment.2

These include four evidence-oriented propositions, namely, that

the evidence (1) failed to establish a prima facie case, (2) did

not warrant a finding of liability on the ADEA count, (3) fell

short of showing willfulness, and (4) did not warrant a finding

that plaintiff sustained non-economic damages in the amount

awarded under Law 100. Appellant's final claim is that the lower

court erred in doubling the two awards.

Because these importunings do not withstand close

perscrutation, we affirm the judgment below.

II. THE ADEA CLAIM II. THE ADEA CLAIM

Since the first three components of appellant's

asseverational array challenge the adequacy of the evidence in

respect to various aspects of plaintiff's ADEA claim, we treat

them in the ensemble.

A. Standards of Review. A. Standards of Review.

The standards of review that appertain to a trial

court's denial of the usual post-trial motions in civil cases are

firmly settled. With respect to a motion for judgment n.o.v.,

now known as judgment as a matter of law, the court of appeals

must examine the evidence and the inferences reasonably to be

extracted therefrom in the light most hospitable to the



2On appeal, Proico offers no developed argumentation
concerning any alleged insufficiency of the evidence vis-a-vis
the jury's finding of liability on the Law 100 claim. Thus, we
treat any such claim as abandoned. See, e.g., Ryan v. Royal Ins.
Co., 916 F.2d 731, 734 (1st Cir. 1990); United States v. Zannino,
895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990).

5

nonmovant, and may reverse the denial of such a motion only if

reasonable persons could not have reached the conclusion that the

jury embraced. See Wagenmann v. Adams, 829 F.2d 196, 200 (1st

Cir. 1987). In performing this tamisage, "we may not consider

the credibility of witnesses, resolve conflicts in testimony, or

evaluate the weight of the evidence." Id.

Appellate review of a district court's disposition of a

Rule 59(a) motion is even more circumscribed; a district court

may set aside a jury's verdict and order a new trial only if the

verdict is against the demonstrable weight of the credible

evidence or results in a blatant miscarriage of justice. See

Coffran v. Hitchock Clinic, Inc., 683 F.2d 5, 6 (1st Cir.), cert.

denied, 459 U.S. 1087 (1982). And, moreover, a trial judge's

refusal to disturb a jury verdict is further insulated because it

can be reversed solely for abuse of discretion. See Freeman v.

Package Mach. Co., 865 F.2d 1331, 1334 (1st Cir. 1988); Milone v.

Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988).

Mindful of the high hurdles that obstruct appellant's

path, we evaluate the evidence referable to the ADEA count with

an eye toward determining whether it can support only one

outcome, or, if not, whether it is so one-sided that the trial

court's failure to defenestrate the verdict constituted an abuse

of discretion. If neither of these conditions obtain, we cannot

disturb the lower court's disposition of appellant's post-trial

motions.

B. The Proof. B. The Proof.

6

Plaintiff worked for appellant in various capacities

for approximately two decades. During the first 18 years, he

performed satisfactorily, spending most of his time maintaining

the company's inventory system. In 1988, appellant reassigned

plaintiff, then 67 years old, to man a sales counter at

appellant's place of business in San Juan. Plaintiff concedes

that this reclassification reflected a legitimate change in

business conditions.

Though the evidence is largely disputed from this point

forward, plaintiff contends, and the jury could warrantably have

found, that he continued to perform his duties ably.3 In May of

1990, however, managerial changes occurred. Manuel Catinchi

became the company's executive vice-president. Plaintiff asserts

that Catinchi soon embarked on a course of age-animated

harassment. The pot began to boil when Catinchi summoned

plaintiff on July 5 and August 1, and criticized his job

performance. A jury reasonably could have concluded from all the

evidence that Catinchi had an ulterior motive in calling the

meetings; contrary to Catinchi's testimony that the sessions were

sparked by customer complaints that had been reported to Soto and

relayed by him to Catinchi, Soto denied having received any such


3At trial, this boast was substantiated by the testimony of
both plaintiff's immediate supervisor, Mr. Soto, and a co-worker,
Nydia Candelaria. Plaintiff conceded at trial, however, that
appellant's general manager, George Gonzalez, had reprimanded him
on approximately four occasions in the 1988-1990 time frame. The
significance of these reprimands to plaintiff's overall job
performance involved a fact determination within the jury's
exclusive province.

7

complaints. In fact, Soto testified, he had never spoken with

Catinchi concerning plaintiff's job performance. Soto added that

plaintiff's work was exemplary.

On August 23, 1990, Catinchi wrote to plaintiff

informing him that he was being "promoted" to head a new office

in Aguadilla, effective September 1. Appellant asserts that this

promotion demonstrates its lack of animosity toward Sanchez. But

a jury feasibly could have viewed the employment decision in a

more sinister light; after all, Aguadilla is located in the

westernmost part of Puerto Rico, a three-hour drive from

plaintiff's home; and at any rate, management knew that plaintiff

did not own a car and that his wife suffered from a disability

that made it unwise (if not impossible) for him to spend

additional time away from home. The company did not offer to

relocate plaintiff or to furnish him transportation, and the

modest pay increase that was to accompany the promotion was not

enough to defray the costs associated with commuting.4

The record is tenebrous as to whether appellant

presented the promotion to plaintiff as obligatory or optional.

For present purposes, we do not think it matters, for, on August

29, plaintiff wrote to Catinchi declining reassignment. His

letter stated that he had "reached the conclusion that all this

has a name and a purpose: harassment and age discrimination to

force me to resign . . . ." The company neither responded to


4The evidence also established that appellant did not have
an office in Aguadilla; its salesmen in the region habitually
congregated at a local Burger King.

8

this missive nor opened an office in Aguadilla. Meanwhile,

plaintiff continued on the job.

On September 18, 1990, plaintiff toppled from a ladder

while at work. He reported to the State Insurance Fund (SIF) to

receive treatment for the injuries sustained. He refrained from

working for several weeks on doctor's orders. On November 9, the

SIF authorized plaintiff to resume employment. When he reported

for duty, however, Gonzalez refused to reinstate him. A

conversation ensued, during which Gonzalez asked plaintiff his

age and then counseled him to collect his pension rather than to

"screw" himself by returning to work. Appellant disputed

plaintiff's version of this conversation, suggesting that any

remarks by Gonzalez were motivated solely by a concern for

plaintiff's health and physical condition.

Having been shut out of the workplace, plaintiff

repaired to the SIF. A functionary there told him that he needed

a letter from his employer as to why he had not been allowed to

reclaim his job. Plaintiff went to appellant's place of business

on Monday, November 12, and again requested reinstatement. His

entreaty fell on deaf ears. He then asked for an explanatory

letter, and was told to return some other time since it was a

firm holiday and only a skeleton staff was on hand.

Plaintiff reappeared later the same week, bearing a

letter he himself had composed. The letter stated that appellant

had "ordered" him to return to the SIF. When he sought to have

Gonzalez sign the letter, Gonzalez's secretary told him to retype

9

it, substituting "suggested" for "ordered." Plaintiff complied,

but Gonzalez still refused to sign the document.

The barring of the company's doors on November 9 and

the events of the following week proved to be the straws that

broke the dromedary's back. When Gonzalez withheld the letter to

the SIF, plaintiff left Proico's premises, went directly to the

offices of the Puerto Rico Labor Department, and filed an

administrative complaint charging age discrimination. Two men in

their twenties assumed his duties on a temporary basis.

Plaintiff never returned to Proico's employ. At first,

he was unable to obtain unemployment benefits (apparently due to

the lack of the required letter) and soon declared bankruptcy.5

He returned to the SIF for periodic medical treatment until he

received a full discharge on March 7, 1991.6 Several weeks

later the company officially terminated plaintiff's employment

and hired a 36-year-old man as his permanent replacement.

Thereafter, plaintiff filed suit in federal district court with

the results previously described.

C. ADEA Liability. C. ADEA Liability.

In a trio of related arguments, appellant maintains



5Plaintiff ultimately secured unemployment benefits, but the
record is silent as to the date.

6With certain limitations (not relevant here), Puerto Rico
law requires an employer to reserve an injured worker's position
for a minimum of 15 days following the employee's full discharge
from the SIF. See P.R. Laws Ann. tit. 11, 7 (1983). Believing
that he had been constructively discharged in November, Sanchez
made no effort to reclaim his job in March of 1991. The jury's
verdict had the effect of validating this course of conduct.

10

that plaintiff failed to establish a prima facie case of age

discrimination, and that the evidence supports neither the jury's

finding that appellant violated the ADEA nor its determination of

willfulness. We deal sequentially with these assertions.

1. The Prima Facie Case. The claim that underlies 1. The Prima Facie Case.

appellant's first line of attack that the case should not have

reached the jury because plaintiff failed to establish a prima

facie case betrays confusion concerning the operation of the

burden-shifting framework that applies in many employment

discrimination cases (including this one).

The ADEA makes it unlawful for an employer to

"discharge any individual or otherwise discriminate . . . with

respect to . . . terms, conditions, or privileges of employment,

because of such individual's age." 29 U.S.C. 623(a). Due to

the difficulties of unmasking intentional discrimination, a task

that has been described as "elusive," Texas Dep't of Community

Affairs v. Burdine, 450 U.S. 248, 255 n.8 (1981), courts have

crafted a burden-shifting framework to be used in cases where

direct evidence of intentional discrimination is lacking. See

id. at 255-56; see also McDonnell Douglas Corp. v. Green, 411

U.S. 792, 802-05 (1973). Under this framework, the initial

burden is on the plaintiff, who must make a prima facie showing

of discrimination.

The prima facie case requirement embodies a concept,

not a mechanical exercise. Though its contours generally follow

the McDonnell Douglas model, a prima facie case must be custom-

11

tailored to fit both the particular animus (e.g., age

discrimination, sex discrimination, race discrimination) and the

particular type of employment decision involved (e.g., failure to

hire, failure to promote, failure to retain). The case at bar is

an ADEA case charging wrongful termination of employment. In

such circumstances, the plaintiff can establish a prima facie

case by adducing evidence that (i) he is a member of the

protected class, i.e., over 40 years old, (ii) the quality of his

work met the employer's legitimate expectations, (iii) the

employer nevertheless cashiered him, and (iv) the employer sought

a replacement with roughly equivalent occupational

qualifications, thereby demonstrating a continuing need for the

same services and skills.7 See Vega v. Kodak Caribbean, Ltd., 3

F.3d 476, 479 (1st Cir. 1993); Mesnick v. General Elec. Co., 950

F.2d 816, 823 (1st Cir. 1991), cert. denied, 112 S. Ct. 2965

(1992); Hebert v. Mohawk Rubber Co., 872 F.2d 1104, 1110 (1st

Cir. 1989).

The burden of making out a prima facie case belongs to



7Appellant insists that plaintiff also had to show that his
employer ultimately hired a replacement who was not a member of
the protected class. The case law in this circuit is to the
contrary. See, e.g., Cumpiano v. Banco Santander Puerto Rico,
902 F.2d 148, 155 (1st Cir. 1990) (stating that "we have never
held that the . . . prima facie discharge case can be fulfilled
only if the complainant shows that she was replaced by someone
outside the protected group"); Freeman, 865 F.2d at 1335 n.2
(explaining that "replacement by a younger person . . . is not an
element of the plaintiff's prima facie case in an ADEA suit");
cf. St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2758 n.1
(1993) (Souter, J., dissenting) (citing Cumpiano and noting that
the Supreme Court has not addressed the question). At any rate,
plaintiff made the showing here.

12

the plaintiff, but it is "not onerous." Burdine, 450 U.S. at

253. All that is needed is the production of admissible evidence

which, if uncontradicted, would justify a legal conclusion of

discrimination. See St. Mary's Honor Ctr. v. Hicks, 113 S. Ct.

2742, 2747 (1993). However, it is important to remember that the

contours of a prima facie case are flexible and situation-

specific. Thus, in applying this rubric to the instant case, we

must take into account a special wrinkle: here, plaintiff claims

a constructive discharge as opposed to an outright dismissal. We

have used the term "constructive discharge" to describe employer

action that makes "[work] so arduous or unappealing, or working

conditions so intolerable, that a reasonable person would feel

compelled to forsake his job rather than to submit to looming

indignities." Vega, 3 F.3d at 480; see also Alicea Rosado v.

Garcia Santiago, 562 F.2d 114, 119-20 (1st Cir. 1977). A

constructive discharge also may occur when an employer

effectively prevents an employee from performing his job. See,

e.g., Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992)

(finding constructive discharge when an employer, inter alia,

"removed all of [plaintiff's] files and then chastised him for

not doing his work"); Parrett v. City of Connersville, 737 F.2d

690, 694 (7th Cir. 1984) (finding constructive discharge where

supervisor removed all work and responsibilities from employee),

cert. denied, 469 U.S. 1145 (1985).

Silhouetted against this backdrop, appellant's argument

seems misshapen in two respects. First and foremost, plaintiff

13

succeeded in limning a prima facie case: he was in his late

sixties; his immediate supervisor and his sole co-worker both

praised his job performance; SIF's physicians believed that he

was medically fit to resume his duties by November 9; he

attempted to return to work on that date, yet appellant refused

to reinstate him and thereafter spurned at least one other direct

request for reinstatement; and appellant concedes that it had a

continuing need for the position. This gusher of evidence

possessed more than enough force to exceed the relatively low

threshold on which the prima facie case requirement rests.

Second, the question posed by appellant's challenge is

fundamentally irrelevant. Once a prima facie ADEA case has been

established under the McDonnell Douglas framework, an inference

of discrimination arises. See Mesnick, 950 F.2d at 823-25

(elucidating the burden-shifting framework). At this point, the

burden switches to the employer to articulate a legitimate

nondiscriminatory reason for the challenged action. This is a

burden of production, not of persuasion; the employer merely must

"set forth, through the introduction of admissible evidence,

reasons for its action which, if believed by the trier of fact,

would support a finding that unlawful discrimination was not the

cause of the employment action." St. Mary's, 113 S. Ct. at 2747

(internal quotation omitted); accord Woods v. Friction Materials,

Inc., F.3d (1st Cir. 1994) [No. 93-2296, slip op. at 9].

If, as in this case, the employer meets the burden of

production, the inference arising from the plaintiff's prima

14

facie case "drops from the case." St. Mary's, 113 S. Ct. at 2747

(quoting Burdine, 450 U.S. at 255 n.10). The plaintiff, who

retains the burden of proof throughout, then must persuade the

trier of fact that he has been victimized by intentional

discrimination. See id. at 2748-49. In this campaign, the facts

that comprised plaintiff's prima facie case may be considered,

but the inference of discrimination originally attributable to

those facts no longer pertains. See id. at 2749; Mesnick, 950

F.2d at 823. To carry the devoir of persuasion on this ultimate

issue, the plaintiff must identify probative evidence suggesting

that the reason given by the employer for the employment action

is pretextual, and, moreover, that it is a pretext for age

discrimination.8 See e.g., Mesnick, 950 F.2d at 823-24; Medina-

Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir.

1990); Freeman, 865 F.2d at 1336.

As can readily be seen from this analysis, when, as

now, an employment discrimination action has been submitted to a

jury, the burden-shifting framework has fulfilled its function,

and backtracking serves no useful purpose. To focus on the

existence of a prima facie case after a discrimination case has



8Depending on the facts of the particular case, showing a
defendant's articulated explanation for an employment decision to
be pretextual may or may not suffice to establish age
discrimination, "particularly if disbelief is accompanied by a
suspicion of mendacity." St. Mary's, 113 S. Ct. at 2749; see
also Hazen Paper Co. v. Biggins, 113 S. Ct. 1701, 1708 (1993);
Woods, F.3d at n.3 [slip op. at 11 n.3]. We need not
probe the point today, as Sanchez adduced independent evidence
which, when credited by the jury, sufficed to establish
appellant's discriminatory animus.

15

been fully tried on the merits is to "unnecessarily evade[] the

ultimate question of discrimination vel non." United States

Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 713-14 (1983);

see also Mesnick, 950 F.2d at 824-25. By like token, our

evaluation of post-trial motions seeking relief from a jury's

verdict in such a case is similarly confined to the ultimate

question of discrimination. Consequently, to wander afield in

pursuit of appellant's phantom "prima facie case" argument is a

bit like undertaking early morning calisthenics: it might be

good exercise, but it certainly is not essential to the business

of the day.

For these reasons, appellant's first argument is

unavailing.

2. Sufficiency of the Evidence. The heart of 2. Sufficiency of the Evidence.

appellant's ADEA challenge is its claim of evidentiary

insufficiency. We have combed the record and detect a surfeit of

evidence from which a rational jury could have concluded that

appellant transgressed the law.

The evidence much of which is highlighted in Part

II(B), supra is copious enough that a lengthy exegesis, laden

with exquisite detail, would serve no useful purpose. It

suffices to say that, although appellant articulated a plausible,

nondiscriminatory reason for refusing to reinstate plaintiff it

contended that he had not sufficiently recovered from his

injuries to resume his duties on November 9, 1990 the jury

rejected that explanation. And the jury's skepticism has strong

16

roots in the record.

It is undisputed that appellant refused to reinstate

Sanchez on November 9. Thus, the jury had to determine whether

that refusal constituted a constructive discharge, as Sanchez

contended, or whether, as appellant contended, it constituted a

bona fide personnel decision based on Sanchez's incomplete

recovery from his injuries. The jury did not have to make this

determination in a vacuum. It heard evidence, for example, about

Catinchi's serial reprimands of plaintiff reprimands that,

given Soto's testimony, the jury could have believed to be bogus.

The jury also heard evidence about a "promotion" that seemed to

be no promotion at all, but more like the kiss of death. The

jury plausibly could have thought the entire Aguadilla affair to

have been a subterfuge aimed at forcing plaintiff's resignation.

Then, too, the jury heard evidence about the SIF's assessment of

plaintiff's health status and supportably could have found

Gonzalez's contrary views to be pretextual, particularly in light

of his refusal to sign a letter to the SIF explaining why

plaintiff had not been reinstated. Last, but surely not least,

after having refused to reinstate Sanchez, Gonzalez questioned

him about his age and made other age-related remarks that the

jury reasonably could have construed as evincing bias. Indeed,

if the jury credited plaintiff's version of this conversation

as it had a right to do, especially since Gonzalez, though

available, was never called to testify at trial Gonzalez's

statements comprise potent evidence of age-based animus.

17

We will not trespass on the reader's indulgence. Here,

a perceptive jury, making permissible credibility choices and

drawing lawful inferences, could conclude that appellant embarked

on a course of conduct designed to purge plaintiff from the work

force; that the sudden offer of a sham "promotion" was a step in

the plot; that, after the promotion ploy failed, plaintiff's

injury presented appellant with a fresh opportunity to reach its

goal; that appellant turned plaintiff away on November 9 despite

its knowledge that plaintiff had recuperated sufficiently to

perform his job, thereby constructively discharging him; and that

appellant's actions were motivated by a discriminatory animus

directed at plaintiff's age. In short, a reasonable factfinder

easily could have resolved liability as did the jurors in this

case without perpetrating a miscarriage of justice. Hence,

appellant has not surmounted the daunting obstacles posed by the

standards of review governing the district court's denial of its

post-trial motions.

D. Willfulness. D. Willfulness.

Next, appellant contends that the lower court erred in

upholding the jury's finding of willfulness. This contention is

unpersuasive.

Willfulness is an issue in ADEA cases because the

statute entitles a prevailing plaintiff to doubled backpay in

situations involving "willful violations." 29 U.S.C. 626(b).

Congress intended this liquidated damage provision to be

punitive, thereby serving to deter willful misconduct. See Trans

18

World Airlines, Inc. v. Thurston, 469 U.S. 111, 125 (1985). For

this purpose, a violation is considered willful if "the employer

. . . knew or showed reckless disregard for the matter of whether

its conduct was prohibited by the ADEA." Id. at 126.

A finding of willfulness requires something more than

merely showing that an employer knew about the ADEA and its

potential applicability in the workplace. See id. at 127-28.

For example, in the context of determining whether a settled

corporate policy violated the ADEA, the Thurston Court concluded

that the company's reasonable, good-faith efforts to determine

that the policy complied with the ADEA sufficed to avoid a

finding of willfulness even though the policy violated the law.

See id. at 129. Willfulness, then, requires an element akin to

reckless disregard of, or deliberate indifference to, an

employer's ADEA-related obligations. See Hazen Paper Co. v.

Biggins, 113 S. Ct. 1701, 1708 (1993) ("The word `willful' is

widely used in the law, and . . . it is generally understood to

refer to conduct that is not merely negligent.") (quoting

McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); see

also Benjamin v. United Merchants & Mfrs., Inc., 873 F.2d 41, 44

(2d Cir. 1989) (explaining that an ADEA violation is willful if

the evidence shows that the employer has not merely "acted

negligently, inadvertently [and] innocently," but has been

"indifferent to the requirements of the governing statute and

acted in a purposeful, deliberate, or calculated fashion").

In Biggins, the Supreme Court held that Thurston's

19

definition of willfulness is applicable not only when the

violation is a "formal, facially discriminatory policy, as in

Thurston," but also when the violation is "an informal decision

by an employer that was motivated by the employee's age[.]" 113

S. Ct. at 1705, 1708-10.9 As in Thurston, the Court noted that

episodic violations of the ADEA in disparate treatment cases need

not automatically lead to the imposition of liquidated damages:

"If an employer incorrectly but in good faith and nonrecklessly

believes that the statute permits a particular age-based

decision, then liquidated damages should not be imposed." Id. at

1709.

We will not tarry. In this case, on any tenable view

of the law, there is a firm factual foundation for a finding that

Proico willfully flouted the ADEA. Here, the appellant's

misconduct lay at the exact crossroads of the antidiscrimination



9Prior to the Court's opinion in Biggins, the circuits were
in considerable disarray as to the quality and quantity of
evidence, beyond evidence of mere awareness, that is necessary to
underbrace an award of liquidated damages in an ADEA case.
Compare, e.g., Dreyer v. Arco Chem. Co., 801 F.2d 651, 658 (3d
Cir. 1986) (requiring "outrageous conduct"), cert. denied, 480
U.S. 906 (1987) with, e.g., Brown v. M & M/Mars, 883 F.2d 505,
513 (7th Cir. 1989) (rejecting the Third Circuit's approach).
The Biggins Court explicitly rejected the Third Circuit's
formulation, and labelled as "misplaced" the concern of various
circuits that application of the Thurston definition was
inappropriate in the context of "an informal disparate treatment
case." 113 S. Ct. at 1709. The Court reasoned that the "only
distinction between Thurston and [an informal disparate treatment
case] is the existence of formal discrimination. Age entered the
employment decision there through a formal and publicized policy,
and not as an undisclosed factor motivating the employer on an ad
hoc basis . . . surely an employer's reluctance to acknowledge
its reliance on the forbidden factor should not cut against
imposing a penalty." Id. at 1709-10.

20

laws and the employment relationship; discharge and constructive

discharge are among the paradigmatic employment decisions to

which the ADEA is addressed, and appellant knew or, at least,

should have known that its corporate behavior ran afoul of the

antidiscrimination laws. Moreover, the jury had an adequate

basis for a finding that appellant's refusal to reinstate

plaintiff was both the culmination of a deliberate strategy and

the crowning blow in a series of actions reflecting age-based

discrimination; or, cloaked in the words of the Biggins Court,

that, notwithstanding the lack of a "formal and publicized

policy" productive of discrimination, there is "an undisclosed

factor motivating the employer on an ad hoc basis," id. The

questionable reprimands, the audiences demanded by Catinchi, and

the so-called promotion could all be viewed as steps toward this

end. And the employer's conduct after refusing to reinstate

Sanchez (including its failure to furnish the SIF with a written

explanation) strongly reinforce the suggestion that what befell

Sanchez was anything but a mere fortuity.

On this pithy record, we are confident that the jury

had a right to weave these several evidentiary threads into a

tapestry of calculated misconduct from which it could infer that

Proico's conduct toward plaintiff was not merely negligent, but

bordered on the contemptible. Appellant's actions clearly fall

outside the safe haven for good faith but incorrect conduct

described in Biggins and Thurston. Thus, the jury's finding of

21

willfulness is unimpugnable.10

III. MENTAL AND MORAL DAMAGES III. MENTAL AND MORAL DAMAGES

Appellant's penultimate point is that, as a matter of

law, there was insufficient evidence to support an award of

damages under Puerto Rico's comprehensive employment

discrimination statute. This statute, familiarly known as Law

100, creates a private cause of action in favor of any person who

is discharged or otherwise adversely affected in employment by

reason of, inter alia, age discrimination.11 An age


10To be sure, appellant maintains that its violation cannot
be considered willful because it did not take reprisals against
Sanchez for refusing the Aguadilla assignment. This reasoning is
specious. At best, this evidence is relevant, but not
dispositive. Moreover, it addresses only one of the several
actions improperly taken against the plaintiff; on this record, a
reasonable jury could have found a willful violation even if it
had determined that the promotion incident, in and of itself, did
not transgress the ADEA.

11The statute states in relevant part:

Any employer who discharges, lays off or
discriminates against an employee regarding
his salary, wage, pay or remuneration, terms,
rank, conditions, or privileges of his work,
or who fails or refuses to hire or rehire a
person, or who limits or classifies his
employees in any manner which tends to
deprive a person of employment opportunities,
or to affect his status as employee, on the
basis of age . . . race, color, sex, social
or national origin or social position,
political or religious beliefs of the
employee or applicant for employment:
(a) shall incur civil liability
(1) for a sum equal to twice the amount
of damages sustained by the employee or
applicant for employment on account of such
action.

22

discrimination action brought under Law 100 differs from one

brought under the ADEA in two significant respects. First, as we

recognized in Wildman v. Lerner Stores Corp., 771 F.2d 605 (1st

Cir. 1985), in an action brought under the ADEA, the plaintiff

retains the burden of proof throughout the trial; in an action

brought under Law 100, in contrast, the burden of proof shifts to

the defendant once the plaintiff has established a prima facie

case. See id. at 609. Second, and more noteworthy for present

purposes, Law 100 permits a plaintiff, upon appropriate proof, to

recover damages for emotional distress (or "mental and moral

suffering," to use the term employed by the district court and

the parties). See Garcia Pagan v. Shiley Caribbean, 122 D.P.R.

193 (1988).

With this preface, we turn to appellant's sufficiency

challenge. As an initial matter, it should be noted that we

consider this challenge only in connection with the district

court's denial of appellant's motion for a new trial. Proico

neglected to make the sufficiency claim when moving for judgment

as a matter of law at the close of the evidence, and, thus,

failed to preserve it for appeal. See Fed. R. Civ. P. 50(b).

This is a fatal omission, for "[if] a defendant wishes to renew a

motion for judgment as a matter of law at the post-trial stage

with a view to having denial of that motion considered by the

court of appeals, the defendant is required to have moved for

judgment as a matter of law at the close of all the evidence."


P.R. Laws Ann. tit. 29, 146 (Supp. 1989).

23

Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 758 (1st

Cir. 1994); accord Jusino v. Zayas, 875 F.2d 986, 991 (1st Cir.

1989). Simply stated, "[a] party may not base its motion for a

judgment n.o.v. on a ground that was not argued in its motion for

a directed verdict." Systemized of New England, Inc. v. SCM,

Inc., 732 F.2d 1030, 1035-36 (1st Cir. 1984).

Although the front door is closed, the back door

remains ajar. Appellant did raise its sufficiency claim in its

motion for new trial and, to that extent, we must consider it in

connection with our assessment of the weight of the credible

evidence. See id. at 1036-37. Having reached a variation of the

issue, however, we can swiftly dispose of it. We regularly have

said that "[t]ranslating legal damage into money damages

especially in cases which involve few significant items of

measurable economic loss is a matter peculiarly within a jury's

ken." Wagenmann, 829 F.2d at 215; accord Ruiz v. Gonzalez

Caraballo, 929 F.2d 31, 34 (1st Cir. 1991). And here, the

deferential nature of appellate oversight is accentuated because,

while the jury originally awarded plaintiff $150,000 for

emotional distress, the district court reduced the award to

$37,500.12 It is a well-established principle that:



12Of course, the district court then doubled the pared award
pursuant to the statutory command that an employer's liability is
for "a sum equal to twice the amount of damages sustained by the
employee." P.R. Laws Ann. tit. 29, 146(a)(2). For the purpose
of our analysis, however, the relevant figure is the underlying
damage award not the doubled award because the doubling that Law
100 requires is not tied to any particular evidentiary showing on
the plaintiff's part.

24

Once a verdict has been trimmed and reshaped
at the hands of the trial judge, an assault
on the remaining amount calls upon [the court
of appeals] not merely to grade the essay,
but to grade the teacher's grading of the
essay. The resultant constraints are not
inconsiderable. We agree with the Fifth
Circuit that "[w]here the trial court already
has invoked its discretion in granting a
remittitur, [the] scope of review is even
narrower than usual." Stapleton v. Kawasaki
Heavy Industries, Ltd., 608 F.2d 571, 574 n.7
(5th Cir. 1979).

Ruiz, 929 F.2d at 34-35 (quoting Wagenmann, 829 F.2d at 215).

The appellant must show, therefore, that the reduced figure

remains so extravagant as to shock the appellate conscience. See

id. at 35.

Appellant asserts that the evidence is insufficient to

allow the award of any sum of money for mental and moral

suffering. This assertion seemingly rests on the absence of

trial testimony from any mental health professional say, a

psychiatrist or psychologist. But appellant cites no case that

stands for the proposition that expert testimony is a

prerequisite to an award of damages for mental and moral

suffering. In other jurisdictions, expert testimony ordinarily

is not required to ground money damages for mental anguish or

emotional distress. See, e.g., Wulf v. City of Wichita, 883 F.2d

842, 875 (10th Cir. 1989) (upholding award of damages for mental

anguish and distress based solely on lay testimony); Busche v.

Burkee, 649 F.2d 509, 519 n.12 (7th Cir.) (rejecting requirement

of testimony of medical or psychiatric experts for award of

damages for emotional distress), cert. denied, 454 U.S. 897

25

(1981); Gore v. Turner, 563 F.2d 159, 164 (5th Cir. 1977)

(stating that damages for emotional distress "may be inferred

from the circumstances as well as proved by the testimony")

(citations omitted); see also Carey v. Piphus, 435 U.S. 247, 264

n.20 (1978) ("Although essentially subjective, genuine injury in

this respect [mental suffering or emotional anguish] may be

evidenced by one's conduct and observed by others."); Marable v.

Walker, 704 F.2d 1219, 1220 (11th Cir. 1983) (holding that

absence of "evidence of pecuniary loss, psychiatric disturbance,

effect of social activity, or physical symptoms . . . go[es] more

to the amount, rather than the fact, of damage[s]" for emotional

distress). We see no basis for imputing a more stringent rule

under Puerto Rico law.13

Over and beyond this hurdle, we think that the evidence

of record adequately supports the pared award. A recovery of

$37,500 for emotional distress can "fairly be said to flow from

the evidence adduced at trial," Ruiz, 929 F.2d at 35, especially

given plaintiff's testimony that appellant's conduct in

wrongfully discharging him not only stripped him of his

livelihood and dignity, but also drove him into bankruptcy.14


13We hasten to add that the district court appropriately
took the absence of such evidence into account in fashioning a
remittitur, finding that "since psychological and psychiatric
evidence was not presented, the record would only support a
$37,500 award for pain, mental suffering, and humiliation." The
plaintiff accepted the remittitur on this count as on the ADEA
count.

14Plaintiff testified that he was deeply affected by having
to declare bankruptcy because he had always "religiously" paid
his debts.

26

Then, too, plaintiff testified emphatically about the humiliation

that he suffered in the course of shuttling futilely back and

forth between Proico and the SIF, and the jury could well have

credited that testimony.

We believe that we have written enough to give the

reader the flavor of the record. Though plaintiff's case on

damages was relatively asthenic, we cannot say that the reduced

award was unjustified or that it offends our collective

conscience. Cf. Wagenmann, 829 F.2d at 215 (finding damages

justified when record reflected "stress, fear, humiliation,

embarrassment, and stigmatization").

IV. DUPLICATIVE DAMAGES IV. DUPLICATIVE DAMAGES

Appellant's last asseveration is that the district

court erred by doubling plaintiff's damages under both the ADEA

and Law 100. This asseveration presents a pure question of law,

thereby sparking de novo review.15 See McCarthy v. Azure, 22

F.3d 351, 354 (1st Cir. 1994); Liberty Mut. Ins. Co. v.

Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992).

In different legal contexts we have several times



15In the interest of clarity we think it worthwhile to note
that appellant does not argue that the underlying damage awards
are duplicative. Indeed, they are not: the jury awarded Sanchez
compensation for the independent losses of backpay under ADEA and
mental anguish under Law 100, see supra note 1. Similarly,
appellant does not argue that either the aggregate damages or the
total punitive damages are so great as to insult due process.
See generally Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1
(1993). Appellant argues only that doubling both underlying
awards is duplicative.

27

expressed the principle that "a plaintiff is entitled to only one

full recovery, no matter how many legal grounds may support the

verdict." Freeman, 865 F.2d at 1345; see also Linn v. Andover

Newton Theolog. Sch., Inc., 874 F.2d 1, 6-8 (1st Cir. 1989).

Appellant argues that this doctrine has application here:

doubling both the ADEA and Law 100 awards, appellant avers,

allows the plaintiff to recover twice for the same loss.

Appellant's postulate does not survive scrutiny.16

Liquidated damages under ADEA are punitive in nature, and are

intended to deter violations. See Thurston, 469 U.S. at 125. In

contrast, the Puerto Rico Supreme Court, in interpreting the

damages provisions of Law 100, has stated that the legislature's

"intent was to devise a formula to redress damages arising from

discrimination in employment." Garcia Pagan v. Shiley Caribbean,

122 D.P.R. 193 (1988). This language fits far more comfortably

with an aim to compensate rather than to punish or deter. To

this extent, then, the ADEA and Law 100 awards serve different

ends and represent distinct types of damage awards.



16The cases relied on by appellant discuss a different
scenario. In the pre-Thurston era, liquidated damages under the
ADEA were often thought to be compensatory in nature. See, e.g.,
Gibson v. Mohawk Rubber Co., 695 F.2d 1093, 1102 (8th Cir. 1982).
When a discrimination victim received both liquidated damages and
prejudgment interest, some courts took the view that liquidated
damages were intended to "cover, among other things, loss due to
delay," and, therefore, held that awarding both liquidated
damages and prejudgment interest would constitute an improper
multiple recovery, for "loss due to delay [is] precisely what
prejudgment interest protects against. Linn, 874 F.2d at 6; see,
e.g., Kolb v. Goldring, 694 F.2d 869, 875 (1st Cir. 1982); Blim
v. Western Elec. Co., 731 F.2d 1473, 1479-80 (10th Cir.), cert.
denied, 469 U.S. 874 (1984).

28

Consequently, the two awards, though calculated in part by the

same formula, i.e., doubling, cannot be deemed duplicative. Cf.

Lilley v. BTM Corp., 958 F.2d 746, 755 (6th Cir.) (holding that

awards for liquidated damages under ADEA and prejudgment interest

under state antidiscrimination statute are not duplicative

because the ADEA's "liquidated damages are punitive [while the]

prejudgment interest [is] compensatory"), cert. denied, 113 S.

Ct. 376 (1992).

Be that as it may, this appeal does not require us to

decide today whether the doubling under Law 100 has a

compensatory thrust. Even if we were to assume arguendo the

opposite, i.e., that doubling under Law 100 is punitive in

nature, appellant would not profit. Punitive damages are

directed at deterring and punishing defendants; they are not

designed to compensate plaintiffs for losses. See Thurston, 469

U.S. at 125; Robertson Oil Co. v. Phillips Petroleum Co., 14 F.3d

373, 383 (8th Cir. 1993), cert. denied, 114 S. Ct. 2120 (1994).

As such, the considerations that operate to bar multiple

recoveries are conceptually and legally inapplicable to punitive

damages. Of course, potential punitive liability may be limited

by legislative intent or due process, see TXO Prod'n Corp. v.

Alliance Resources Corp., 113 S. Ct. 2711, 2718-19 (1993);

Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 14-15 (1991),

but appellant has not argued either of those aspects in this

appeal. And apart from statute or constitutional considerations,

we know of no legal concept of duplicative awards that functions

29

as a limitation on exemplary damages.

Thus, we come full circle. Regardless of whether the

doubling of a Law 100 award for mental and moral suffering is

conceived to be compensatory or punitive in nature, appellant's

argument fails.

V. CONCLUSION V. CONCLUSION

We need go no further. The record reveals ample

evidence to sustain the jury's finding that appellant willfully

terminated plaintiff's employment due to his age, thereby

transgressing both federal and Commonwealth statutes. The

ensuing damage awards, as refined by the district court, are also

within lawful parameters. Proico's ship has sailed.

Affirmed. Affirmed.

30